Hear ye, hear ye. This Honorable Health Court of the 2nd Judicial District is now open. The Honorable Robert D. Clarke will be presiding. Please be seated. Mr. Clarke, you may call the case. Yes, Your Honor. The first case on the docket this morning. We have 23-0146. The people of the state of Illinois plaintiff Appellee v. Paolo Sarellana defended at Bennett. Arguing on behalf of the Appellee, Mr. Kevin Q. Bennett. Arguing on behalf of the Appellee, Mr. Max C. Fuchs. Thank you. Mr. Bennett, you may proceed. Thank you. May it please the Court. Good morning. My name is Kelly Bennett, counsel for Appellant Paolo Sarellana. This is an appeal that comes from conviction of a misdemeanor domestic violence charge from October 28, 2022. And there are three areas where I'll be highlighting this morning in terms of error that Appellant defendant believes occurred. The first is that during testimony, the state was allowed to use an interpreter to impeach the complaining witness through the interpreter's testimony. Why do you call it testimony? I call it testimony because it's in direct contradiction to what the complaining witness, Mr. Colon Vega, testified to. He testified in English. He's a bilingual individual. And he testified throughout trial in English. He had no need for the use of an interpreter. There was a statement-  Yes, of course. I don't believe you're arguing that the interpreter listened to the victim and then translated it from English into English. I am not arguing that she listened to him. Well, that's not entirely true. What's not true about that? So, prior to trial, the state, through their own accord, created an English translation of this statement. Doesn't that seem reasonable unless they have all bilingual staff? Well, it seems reasonable if it didn't leave their office. I understand. I understand that the prosecuting attorney said, look, I needed to do this because I don't speak English. Spanish. I'm sorry. Thank you. Spanish. But she went beyond that. The state's attorney's office went beyond that and provided that translation to the interpreter. Is there anything, though, in the record that would indicate that the translator, the court-appointed interpreter, under oath, deviated from exactly what was written in Spanish? And I'll concede I don't speak Spanish either, let alone read it. Before she even gave her testimony, there was a question by the court as to, look, are we even going to need you, Madam Interpreter? And the court inquired of the interpreter, and the interpreter responded, as far as I know, Judge, it's for a statement, just a couple sentences that was originally in Spanish. There's a translation, and it's accurate in English. This is before testimony even occurs. So I would say yes. I mean, the translator came in with having reviewed this translation and telling the court ahead of time, yes, I have a translation. I was given a translation by the state. It's accurate in English. So I do think that... Was there anything different between the English translation, the written document created by the state, and what the interpreter testified to, stated under oath, as she read the witness statement in English? So that's where one of our problems is. The only way for the defense to know that is to subject this to the mechanisms of cross-examination. Wait a minute. You have the document, and you have the transcript of what she said. Is there any difference? We were never provided ahead of time the translation. But you have it now, and my question is, what's your argument on appeal, that they are different? And if so, how? Well, I would go back to the trial and say, at that point, the only way to determine whether they're different or not or if there's dialect that's different is to subject the translator to cross-examination as to whether there's a dialectal difference, when she received the translation. We know that she read the translation ahead of time because she told the court before Mr. Colón Vega even testified that she had in her possession a translation. It was his written statement, wasn't it? I think that conclusion can be made. Mr. Colón Vega stated it was his signature on... And it was his handwriting. Yes, correct. So why didn't somebody who's making the argument that there was error either have another translator or slash interpreter come to court and testify or even have the victim read in English what he thought he wrote in the statement? Well, the purported victim did testify in English what it said and what it didn't say. He was asked directly, does this statement say that she slapped me? And he said no. So he did testify. But did he say what it said? In other words, did somebody ask somebody on behalf of your client to state what the document said instead of answering questions about what the document said? Not in those terms. How do we know that there's any prejudice if there's no controverted evidence other than your statement that he said no? Well, we know what the court relied upon in finding my client guilty. And part of it is the statement. And in terms of whether there's prejudice, I think an interpreter's job is to interpret contemporaneously, not to come into court. You have any authority for that? Because if that were the case, then how does any evidence that isn't in English, unless we're in Canada in which case it's English and French, how are you going to establish what you just said? Because it means that supposedly it won't be admissible. Or the interpreter is then subject to cross-examination to explore that, to explore that option. The Schneier court, which is still good law, says it cannot be the law just because an interpreter is called who is not capable of correctly translating the evidence or from bias or partiality renders it incorrectly that the parties be bound by it. The fact that the interpreter had this ahead of time, the only way to explore that would be through cross-examination. And it wouldn't be an extensive cross-examination. Did you say whether she saw it before? She said she saw it before. I guess I'm having a problem with the idea that if you see something previously to when you relate what you're translating from a written statement, that that somehow makes your testimony more or less reliable. Well, unless there's something in the document that is of some mystical abilities to force people to fog their minds, you know, like the shadow did. Sure. So is there anything that you know of that could make this court-appointed interpreter have some difficulty relating what the words on the paper were? I would suggest the only way I would know that is if I had been given the opportunity to cross-examine the interpreter. And the interpreter didn't just look at it ahead of time. What would have been some of the questions that you would have cross-examined her? I would have asked her if there's a difference in dialect. I would have asked her... A difference in timeline? Dialect. Dialect. Dialect, idiomatic expression? Sure, yeah. The Schneider court had a case or discussed, you know, the difference in a word in German. So I would have asked her about that. I would have asked her if she's relying upon this document. If she wasn't relying upon it, why would she come to court with it? She had it in her hand. The only way the defense knew about it is she walked past the table and we saw a document in her hand, which we were then allowed to review, take a break, and ask if we wanted to come back and after conversation with my client, we decided to push forward. But I do suggest that an interpreter who comes to court with an English translation that the state prepared and gave to her, I think I would ask her about her qualifications at that point. And I think that would be fair. But if someone is a court-appointed interpreter, even though the court may not have necessarily appointed the interpreter in this particular case, because apparently she appeared at the behest of the state, is that a sufficient foundation to establish the admissibility of her testimony? I think based upon what the court relied upon to find my client guilty. The court specifically said with Mr. Colón Vega calling 911, which is another issue we have. How do you reconcile the admission or the testimony or the statement made by your client that she did strike the victim in the face, slapped the victim in the face? Told that to the police officer. She did. She did. So how is prejudice arising in this situation, considering the admission? Because there was no, in terms of that admission, there was no time frame established. There was no facts surrounding it established. The officer testified that he arrived at a place in Aurora. He didn't even know where he was. There was no specific time frame with regard to my client's admission to the officer as to when these events occurred. The court essentially told us they relied or it relied upon three things in finding Ms. Colón Vega guilty. Did you move to strike the testimony of the police officer on the basis that a foundation was not laid? No. Because you're arguing a foundation, aren't you, when you say location, time, date? Sure. Yeah. Were you the trial attorney? Yes. Are you confessing in effectiveness of counsel? No, of course not. Of course not. With regard to what the court found or what they relied upon, they relied upon a 911 call, the police coming to the house, and Mr. Colón Vega giving a written statement. As the panel knows, we have a problem with the statement. With regard to 911, the court, when they disallowed that call, the trial court summarized it themselves by saying, we don't know what the passage of time was between the alleged event and the call. A statement relating to the circumstances of the occurrence. I don't think we even know yet what he said to 911 purportedly or why he called them. So it's the court's own language, frankly, that gives rise to lack of foundation and lack of reliability for what was said in the 911 call. But the court then relies upon the fact that a call was made. Very specifically, going back to the interpreter's possession of the translation, I think that's significantly prejudicial because the interpreter tells us before we even get into testimony, she has an accurate translation. And this is something that the defense wasn't afforded prior to trial. And at the very least, we should have been allowed the vehicle of cross-examination to explore the areas that we discussed. In particular, the qualifications of the translator. Counsel, you had the Spanish language, the original handwritten statement prior to trial. Correct. So why is it incumbent on you to then determine what you think it ought to say in English? Well, it's not incumbent upon me, but the complaining witness testified what it did and what it didn't say. And then, after Mr. Colon Vega testified what it did and did not say, the state utilized the services of the translator to impeach him without being subject to cross-examination. So what I'm wondering, I counted 25 words in the entire statement. So what is an alternate or alternative interpretation of those Spanish words? Because there's not much there. There's not much there. I mean, the court chooses when to listen to give Mr. Colon Vega credibility in terms of he called 911, in terms of, yes, it's my signature on the statement, and when not to give him credibility. No, it doesn't say that she slapped me. So the alternative translation would be, it doesn't say she slapped me. And that, the interpreter's testimony that this is what it says, she slapped me, is in large part, I would argue, what the guilty conviction was based upon. Wouldn't there be a question for Cross of Mr. Vega that it doesn't say slapped? What does it say? Obviously you're opening a can of worms there, but we're not left with any alternate interpretation of these words. I think we are when Mr. Colon Vega says, no, it doesn't say she slapped me. I think that's an alternate translation. I don't think it's incumbent upon us to then, on the defense, to then say, well, what does it say? That's the state's job. And they use the interpreter without the interpreter being subject to cross-examination, and with giving her a translation we didn't have privy to. It's one thing to say that you don't have to do it at the trial court level, where there's a presumption of innocence prior to judgment. What about the court, this court, insofar as establishing prejudice? I would suggest we have established prejudice. I don't think that an interpreter who has told the court it's in possession of an English translation that's accurate before she even comes up to provide testimony, which I'm going to call testimony, I think that is prejudicial. Did she come up with the first interpretation, or was she just reading some other individual's interpretation? And the reason why I ask is because if they're different than what she testified to, then you might have been able to establish a prior inconsistent statement. My understanding is that she had an interpretation prepared by an administrative assistant in the state's attorney's office upon what I'm arguing, upon which she relied. Any other questions? No. Thank you. You'll have an opportunity to make your button. Thank you very much. Mr. Booz, is that how you pronounce it? Booz. Pardon? Booz. Booz. Booz. If I can spell it here, because it's B-double-O-S-E. It's similar to moose, Your Honor. Oh, okay. But kind of like... Never mind. If I may have a moment to set up. Go ahead. Okay, let's just cut right to the chase. Why not allow cross-examination of the interpreter? Because she didn't testify, Your Honor. The presentment of... You're talking about qualifications. Isn't that always subject to cross-examination when you're offering her as an expert in the Spanish language? Your Honor, because the translator was acting as a court-appointed translator, then that's not the procedure for using a translator in court. That would inject needless fishing expeditions into the translator's background, into conjecture about bias or prejudice. And so there's a reason why we don't do that. There are translators used every day, many times, and to, as a matter of policy, require searching cross-examinations of every translator that is used is unnecessary, unhelpful, and improper. Is there a special oath that is given to interpreters? Yes, and the court in the transcripts of this case specifically identified that the oath the translator was operating under was the translator's oath and not of a generic witness. Before the translator is sworn in, the court reporter doesn't specifically identify the language of the oath, but the court specifically identifies before that that they are being sworn in as a translator specifically. Counsel, on that note, why isn't the argument here from the defense that the translator is impeaching the testimony of the witness? Why is that incorrect? Because the statement that is made, the actual facts being presented and established, were made by the victim. They are not made by the translator. And to say that the translator is impeaching that witness is to say that every time a translator does their job, there are two witnesses testifying. The translator is not, under Crawford and the related case law, the translator is not giving information on a previous occurrence, which is what is required for testimony. Instead, the translator is just providing a contemporaneous statement to the court if the court does not understand Spanish, what is being said. The two reasons we have translators are, one, for the defendant to be able to participate meaningfully in his defense, and two, for the finder of fact to be able to appreciate all the language that they're being exposed to, regardless of which language. This serves the latter purpose. So now they get disputes on the stand, that the statement says, through the computer, and she slapped me. He specifically denies that the statement says those two things. Correct. So why does that not put the accuracy of the translation into question? Two reasons. First, Your Honor, that is a confrontation, not a translation. The people are obligated to confront him with his prior statements, including specific portions of them that's demonstrated in the case law. That's what the people were doing. However, that is not the same as asking for a translation. I can submit to you that the statement does not say that he is covered in purple polka dots. That does not mean that I have provided a translation of the statement. The denial is not a translation. For that reason, there is no problem with the translator acting here because, again, she is merely providing the court with a basis to engage with something that is not in the court's language. To suggest otherwise would be to promote gamesmanship and the use of non-English language as a means to provide additional hurdles to the proper presentation and understanding by the finder of fact of the evidence. Now, when the court... Counsel, regarding the cross-examination issue, was there any offer of proof made as to the questions that were to be asked and what the defendant thought would be the testimony? Never, Your Honor. And that's one of the problems that has persisted throughout this case is we have no idea if this is a fishing expedition, if there's a legitimate basis for cross. And in particular, the two stated reasons that defendant identifies at any point are functionally that the victim denied the translation as presented later and to that... Sorry, to address that first, again, that was a denial of the statement where the victim had already been found not credible in terms of demonstrating a clear bias towards the defendant. So defendant's denial, to the extent it conflicts with the translation, is only of merit if it has credibility. It did not. The trial court made a specific finding that the victim was evading questions, was refusing to respond, and particularly when those questions were asking for damaging evidence against the defendant. So that credibility determination prevents defendant from relying on that denial because the victim didn't have credibility in disputing that fact. Well, isn't the... Wasn't the translation in the document admitted into evidence on the basis that it was a prior and consistent statement that under the rules of 115.10 could be used substantively because the witness acknowledged that they had said or had written those things? Correct, in three different ways. First, he stated he signed it. Second, he stated that it was his handwriting. And then later, in referencing the document, he said that, which I wrote something to that effect. Because of that, it was properly impeaching, not only because he acknowledged he wrote it, but... You said impeaching. I said substantive. 115.10 is not impeaching. It's substantive. I apologize. I meant that it was inconsistent and therefore properly admitted substantively. And it was inconsistent because while he testified as to what the statement said or didn't say when confronted with it, he otherwise testified that he had no recollection and was unable to provide testimony as to what occurred that night. Didn't he say, I'm not saying I didn't write it, I'm just saying I just don't remember? Correct. And that's specifically when the people asked him and confronted him after he agreed that he signed it, but with some ambivalence. So then the people asked directly, did you write this? Are you saying you didn't write this? And that's where he fell back to saying that he merely did not recall doing so. He then attempted to rely on that purported lack of memory in order to avoid testifying about it at all and was required to testify as directed by the court. That was one of the reasons the court found that he was being evasive. So would you say then that bottom line, this witness never outright denied making the statement? Well, even if he had, he had already agreed that he had signed it and it was his handwriting. You didn't answer my question. Pardon me. Did he ever outright deny making the statement? No. And when given the opportunity to, he declined to do so. But he did deny that the statement said that the defendant slapped him. Yes. Though also admitting that it stated that she had pushed him. The court reflected that this agreement, even outside of his denials, he did agree that the defendant was behaving aggressively that day when there was contact made, as established by the other evidence, to be clear. So he denied that the statement said that she had slapped him. But he never denied, because he couldn't remember, that she had slapped him? It was his claim that he did not remember generally that the statement itself did not state that she slapped him, but agreed that she had pushed him and something to the effect of knocking the 3-D printer over. And that's where, while the people strongly insist that this was non-testimonial, that translators should not be subject to cross-examination without a specific basis identified by the defendant as an issue with their testimony in line with the case's defendant's sites. Moreover, this is not a case where a defendant can establish harmful error. First of all, there was no identification of the basis for the cross-examination. Of the interpreter? Yes. So the defendant hasn't suggested what would happen if cross-examination were to occur. And so this alleged error in being unable to cross-examine the interpreter does not give rise to a reason to think that error contributed to the conviction, which is the first basis to find harmless error, where there's no basis for showing because of the lack of cross-examination there would have been an effect on the conviction. Or in other words, that the inability to cross prevented a fruitful discussion of anything. Because of harmless error? Yes. If ever. And the people, to be clear, are not conceding that. But we do insist that the defendant is not able to present harmful error, and moreover that the record shows any error was harmless. This interpreter was specifically admonished to translate the document in front of her. If jurors are believed to follow the court's instructions, then certainly the court's own employees should be as well. As to the overwhelming weight of evidence, here there was the fact of the 911 call, not its contents, but that the victim was sufficiently moved by the events to call 911 and bring authorities to the location that the victim's own testimony, the admissions made there from the visible upset of the victim at the location, the defendant's own admissions to actually striking him, and to knocking over the 3D printer showing that she was aggressive in general and also violent specifically towards the victim, and the redness on the victim's cheek corroborating that there had been contact all showed the evidence was overwhelming in this field. If I may have a moment. Now, regarding the translator being a testifying witness, I'm not going to belabor the points I previously covered. However, notably, this was not treated as witness testimony. Translators are not required to be placed on witness lists. Translators do not receive the same oath, and translators are not properly considered in the same position as another witness. One point that the defendant raises is that the people in the court questioned her term, the translator, that the people were allowed to question the translator that the court was allowed to question. The actual statements that were made were the court prompting the translator to do their job and translate the document, pardon me, the people asking that the translator do their job and translate the document, and then the court stating functionally, are you finished? Have you accurately translated the document? That's it. That is not equivalent to the cross-examination that the defendant insists on now at appeal without describing the contents of that cross-examination itself. What about a question, something like this? Madam Interpreter, which word of these 25 is translatable into SLAPP? Your Honor, since that is a specific linguistic analysis point, that would present a different question. Certainly it is more in line with an opinion based on the interpretation of something instead of providing a direct translation where there's no suggestion by anyone, including the victim, defendant, through any other witness or anyone else, providing a basis to question the translation itself. Notably, the defendant had access to the victim, was able to talk to him about his statement clearly, as demonstrated by the bias he showed through the testimony. This was not a victim that was hostile to the defendant, as the findings by the trial court showed. Can we take judicial notice that one of the words in the statement is a verb or a nominalization that relates to a SLAPP or a blow or some sort of blunt trauma between a portion of the defendant's body and the face or the head of the victim? If it is a matter of public knowledge and opinion, then yes, Your Honor. However, part of this problem is that we don't have a real contest about any of this, that we don't have anything suggested below, in line with defendant's case, Carmona-Olivara, where the defendant should have been allowed to pursue an avenue they actually identified as contesting the translation. That is not what we have here. And moreover, that case specifically talks about the jury or court trying the issue,  when they don't speak the language that the trial has conducted, when the evidence is not based on the language the trial has conducted it. What if there were two interpreters and they both came up with different interpretations that were inconsistent? Then we'd have an argument, Your Honor. Then we would be more in line with an actual discussion about what component parts there are that we can create a controversy out of, which we don't have here. Again, we can't manufacture this contrast on the record we have, and shouldn't. Any other questions? No. Thank you. Thank you, Your Honors. Mr. Bennett, you may proceed with rebuttal. Thank you. We do know that what the court relied upon in large part in convicting Ms. Sarayana, that's a 911 call, and the court stated initially, we don't even know why he called them. So that reliance is certainly prejudicial and detrimental. The court also says that Mr. Colombega gave a written statement regarding the defendant's physical conduct, which we discussed extensively. If you take one or two of those away, how can the court continue to look at the context of the totality of the circumstance and determine that it rises to the level of the physical conduct of the insulting or provoking? We have to consider it in the light most favorable to the State. Counsel, don't we also have the admission by your client that she slapped him in the face? You do have that admission. And combined with the observation of the officer that there was redness to his left side of Mr. Vega's face. Isn't that the end of the ballgame? I don't think so. Would those not stand alone as sufficient evidence to convict? Those would stand alone. But the court is looking at the totality of the circumstance and looking at the statement of Mr. Colombega. These are the court's words. And looking at the 911 call, which didn't come into evidence. So the court is telling us what it relies upon to find this Sariana guilty of the offense charged. Are there any other questions? Do you see the situation arising sometime in the future where that statement will be scanned into? A computer and a translation will be printed out? Or an artificial intelligence will translate that? Relying upon artificial intelligence to translate that, I think, is certainly problematic. Because even within our own country, we have different dialects throughout the country. So the parameters would have to be pretty specific. Well, I would think that if we're going to have artificial intelligence, it could be Venezuelan or Mexican or Puerto Rican. Even within those countries, I would think that there's a dialect from region to region. That wouldn't prevent you from having a human testifying, contrary to the artificial intelligence. Correct. And to restate, I mean, the biggest problem we have with that translation is tendering the internal memo or internal document to the translator who then brought it to court and had it with her seconds before she was asked to give the translation. I'm not going to ask you to answer this, but did you do research on what word in the statement was indicative of the nominalization or the noun to slap or verb? I did do that research. I did do that research. But as Your Honors know, at trial, we have what is presented at evidence. And very clearly, Mr. Colón Vega denied that that is what it said. And the translator was used to impeach his testimony. Okay. Any further questions? No further questions? No. I used to be in traffic court, and there were Hispanics that were criminals, or I should say traffic violators. And they would have their own translator who was a relative or a friend. And it was very interesting because I had four years of Spanish, and so I had some idea of what the question was and what the answer was and what the English answer was. And it was very entertaining because sometimes it didn't work out right. I'm sure. In any event, thank you. We'll take a recess. We have other cases on the call. Thank you very much.